SIGNED THIS: September 13, 2024

**Peter W. Henderson**
**United States Chief Bankruptcy Judge**

___

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE:<br><br>JEANNE E. BENNETT,<br><br>Debtor. | Case No. 23-80796 |
| SUSAN E. DEVORE-SLAUGHTER,<br><br>Plaintiff,<br><br>vs.<br><br>JEANNE E. BENNETT,<br><br>Defendant. | Adv. No. 24-8001 |

OPINION

The Plaintiff, Susan DeVore-Slaughter, wrote the Debtor-Defendant, Jeanne Bennett, an $8,000 check for a "personal loan" in December 2021. Bennett did not repay the loan before filing a Chapter 7 bankruptcy petition nearly two years later. DeVore-Slaughter filed an adversary complaint alleging that the $8,000 debt is nondischargeable in Bennett's bankruptcy because it was obtained by a false representation. 11 U.S.C.

§523(a)(2)(A).[1] The matter is before the Court after a trial on the merits at which both parties represented themselves without the aid of counsel. For the following reasons, the Court concludes that DeVore-Slaughter did not meet her burden of proof that the loan was obtained by a misrepresentation and therefore Bennett is entitled to judgment in her favor.

I.     **Jurisdiction**

The Court has jurisdiction under 28 U.S.C. §1334(b) and Local Rule 4.1 of the United States District Court for the Central District of Illinois. Determining the dischargeability of a particular debt is a core proceeding. 28 U.S.C. §157(b)(2)(I). Because this matter stems from the Debtor's bankruptcy itself, the Court has constitutional authority to enter a final order. *Stern v. Marshall*, 546 U.S. 462, 499 (2011). Both parties have consented to the entry of final order by this Court.

II.     **Findings of Fact**

    A.     **The trial evidence**

The parties were friends who had spent time with each other socially before the loan of December 2021. Bennett was a hairdresser and DeVore-Slaughter often came to her salon both to obtain services and to chat. After filing for bankruptcy, Bennett characterized DeVore-Slaughter as an "occasional" or "on-again, off-again" client. She testified at trial that DeVore-Slaughter was also a friend, but "she was one of those friends that … came in 3 or 4 times a day sometimes" to Bennett's salon, which was located two blocks away from DeVore-Slaughter's house. Bennett's testimony made it clear that she felt she was on friendly terms with DeVore-Slaughter but sometimes tolerated her presence more than welcomed it. Some of the text messages introduced suggest otherwise, and the Court believes Bennett's current recollection of their friendship has been clouded by the current dispute. DeVore-Slaughter, for her part, frequently gave Bennett gifts and invited her on trips. (For example, they attended a convention together.) DeVore-Slaughter was disappointed when Bennett did not act as

---

[1] DeVore-Slaughter also alleged in her amended complaint (Doc. #7) that Bennett was not entitled to a general discharge under 11 U.S.C. §727(a)(4). She withdrew that allegation at the pre-trial conference of June 11, 2024, and confirmed at trial that she was proceeding only under §523(a)(2)(A).

2

she thought a good friend would, such as when Bennett did not attend DeVore-Slaughter's mother's funeral after she died on November 27, 2020.

Bennett had invited DeVore-Slaughter and her son, Mason Hultgren, over for Thanksgiving dinner at Bennett's house the day before, on November 26, 2020. Testimony was received about who exactly attended the dinner and what was discussed, but those details about a conversation that occurred over a year before the check was written are immaterial, so the Court need not resolve the factual discrepancies. Hultgren testified that there was a discussion of money, including how much money DeVore-Slaughter might receive from her mother's estate. Bennett and her mother Janet flatly denied any such conversation occurring. No evidence established any specific conversation between Bennett and DeVore-Slaughter about borrowing that money to pay Bennett's bills, including in particular her real estate tax bills. What is clear, whether it was discussed at Thanksgiving or not, is that DeVore-Slaughter was aware before writing the $8,000 check that Bennett was struggling financially.

DeVore-Slaughter's mother's estate took some time to settle. In December 2021, Bennett and DeVore-Slaughter talked about Bennett's financial situation and Bennett was aware that DeVore-Slaughter had inherited some money. Bennett asked DeVore-Slaughter for a loan of $5,000 to cover her credit card bills. The two exchanged text messages on or about December 27, 2021:

**Bennett**: What r ur thoughts on letting me borrow 5,000? I will sign a note or something that I will pay u 50-$100 a week until it's paid off?

**DeVore-Slaughter**: Do you you can sweeten the pot by doing my hair once in a while?? [emojis] I'm LOOOKING OLD!!!
Lol
You're always SO booked up!!
But yes I can do that.

**Bennett**: That's a deal. I can do ur hair tomorrow
Do u have to ask the bank? I don't want anyone to know.

**DeVore-Slaughter:** NOPE it's mine

3

**Bennett**: Is It going to put u out or run u low?

**DeVore-Slaughter**: Nope

**Bennett**: I am 7000 in cc debit all from September! It is giving me anxiety. Please know that I am not using u! U r my friend & I never ask anyone for help. I'm just so down because of this. I didn't know who to go to & after the bank declined me I didn't know what to do.

**DeVore-Slaughter**: I can go to Wells Fargo tomorrow before or after our trip to the casino.
I can get the whole 7000.00

**Bennett**: How long will that take me then? I was figuring a year for the 5000. 52 weeks x's 100
Is 5,200
I'll Venmo u & keep a notebook of every week I pay u & every time I do ur hair. It will be legit.

**DeVore-Slaughter**: It would be 70 months which is 1 year and 18 weeks which is 4 1/2 months. (But I'm not good at math lol)
So if I gave it to you tomorrow, all of 2022, then until the middle of May in 2023. Sound right??

**Bennett**: R u 100% not going to get in trouble?

**DeVore-Slaughter**: Nope
I can do with it whatever I want and actually this would be good because this once I get the house your extra $400 coming in every month will help me make my mortgage so it's a good thing
And you're not having to pay interest
OK maybe you'll have to pay interest by doing my eyebrows once in a while

**Bennett**: Deal

4

Defendant's Exhibit D. The conversation shows that Bennett sought a loan of $5,000 to pay off credit card debt, but she was concerned that DeVore-Slaughter might not have access to the funds from her mother's estate in order to make the loan. DeVore-Slaughter reassured her that the money was entirely hers to spend and offered to loan $7,000 to completely cover Bennett's credit card debt. The proposed repayment terms were informal and friendly. No mention was made of real estate taxes.

The next day, on December 28, 2021, DeVore-Slaughter came into the salon. She initially was going to write a check for $7,000 but she wanted Bennett to have the opportunity to purchase a dryer[2] so she increased the amount to $8,000. Bennett interpreted the additional $1,000 to be a gift, rather than a loan, although she was motivated to do so. (In other words, there may have been some ambiguity; DeVore-Slaughter may have intended for the entire amount to be a loan, and Bennett may have hoped that the additional money was a gift.) Bennett expressed gratitude at DeVore-Slaughter's gesture by texting her later that night:

> I'm still in a daze.
> I am completely in awe of u doing this for me! Just the thought of becoming debt free beside truck & house! U r a rare breed & a true friend! I hope u know that.

Defendant's Exhibit C.

Three months then passed without any payment. On March 8, 2022, Bennett texted an image showing a credit card balance of $3,919.78. Plaintiff's Exhibit 3. On April 3, Bennett texted DeVore-Slaughter:

> I called the bank to ask them if I can add 5000 to my mortgage. I can't, but they did say I can get a unsure loan hopefully with a small interest rate, so if I can I will pay off my cc & then I can start paying u.

Defendant's Exhibit B. DeVore-Slaughter texted back only, "????" before the conversation turned to other matters.

---

[2] Bennett testified that she was given an extra $3,000 for a dryer and a couch. In April 2022, though, she told DeVore-Slaughter that she was only given $1,000 extra for a dryer. Plaintiff's Exhibit 2-T. The Court finds it more likely that DeVore-Slaughter made out the check for $8,000 based on the $7,000 of credit card debt she had learned about the day before with an extra $1,000 for a dryer.

5

On April 8, Bennett reported that the bank would not give her a loan but that she would "try to start giving u $50 is that ok?" Plaintiff's Exhibit 3. DeVore-Slaughter said that was fine but asked if Bennett would have money for a trip to New York they had planned to take. Bennett said she would, "and if I don't I'll just have to use the credit card I'm trying to pay off." About a week later, though, Bennett backed out of the trip. She had thought her son, who was in the Navy, would be in New York at the same time for "Fleet Week," but it turned out that he would actually be home in Illinois at that time. She was afraid that DeVore-Slaughter would take the news hard, which she did. The pair exchanged text messages starting around 4:45 p.m. on April 18, 2022:

**Bennett:** U r that mad & not understanding?

**DeVore-Slaughter:** Oh I think I'm very understanding but the fact that if this had been the first time this is happened no problem but this isn't the first time that it's happened Jeanne and as I went back through it with Dr. Doyle today and Mason over the weekend and the whole 9 yards this is not the first time that you have made plans and then not come Thru
I can't say that I thought that the money that I gave you was to pay off your credit card and let you get ahead of things and now you're telling me that you asked for $5000 extra on your house payment so that you can pay off your credit card and then start paying me back

**Bennett:** I get that, how is this my fault? It's the military. I bummed too. But I want to see my son.
I had 3 cc. That money u gave me paid off 2 & I have one left. Like I said to the bank people don't realize my job isn't normal! My paycheck alters every hour. People cancel, no show & reschedule. So those weeks I don't make what I need I HAVE to use my cc. It's a vicious cycle. I appreciate the two that got paid, I was way over my head and u helped a lot.

6

> **DeVore-Slaughter**: Well from what I'm getting from you you're over your head now and you're needing money for this other credit card and you owe me money which I have an[3] asked for a dime for the last four months but yet you guys have planned a two week vacation ….

Defendant's Exhibit A. Neither party testified in detail about the meaning of these messages. The Court notes DeVore-Slaughter's admission: "I can't say that I thought that the money that I gave you was to pay off your credit card and let you get ahead of things and now you're telling me …" Read literally, the sentence reads that DeVore-Slaughter "can't say"[4] that she thought the money was to pay off Bennett's credit cards. Read in context, though, the introductory phrase ("I can't say that …") is inconsistent with the rest of the sentence, which expresses surprise: DeVore-Slaughter thought Bennett's credit cards had been taken care of with her loan, so why was Bennett now telling her that she still owed money on her credit cards? That is the way Bennett interpreted it, clarifying in response that DeVore-Slaughter's loan covered two of her credit cards but that she still owed a debt on one credit card. DeVore-Slaughter did not question the premise even as she was upset that Bennett was poorly managing her money. The Court finds that DeVore-Slaughter understood "that the money [she] gave [Bennett] was to pay off [her] credit card."

An argument ensued. The Court does not have the full record of their conversation. At 6:30 p.m., Bennett left a voicemail telling her side of the story:

> [Y]ou gave me the extra thousand when we were sitting there in the salon you said hey I wrote that for an extra thousand just because I love you and I want you to have a matching dryer[. Y]ou told me I didn't have to pay that thousand back[.] I'm not gonna pay you $50 a month I was going to pay you $50 a week and I don't want a lawyer involved in this you can trust me[. S]o I don't know why you're getting all this craziness involved now please call me…

---

[3] The Court interprets "have an" to mean "haven't."

[4] No testimony was offered about how these text messages were written and whether the text was affected by either text-to-speech or autocorrect. It may be that one of those two alterations is responsible for the confusing syntax. See n.3, above. Regardless, the Court's interpretation of the message is based on the surrounding context and the Court's assessment of the credibility of the witnesses at trial.

Plaintiff's Exhibit 2-T. Either before or after that voicemail, Bennett texted that she would "pay the 7,700"[5] but asked DeVore-Slaughter to never again contact her and that she now knew "why u can't keep friends." Plaintiff's Exhibit 3. The last message introduced into evidence from that evening is Bennett's text stating, "It was a verbal agreement, I will send u $ so give me ur address. I'm not signing anything." *Id*.

Before Bennett had a chance to make any payments, however, she fell and broke her scapula and was out of work for six months beginning in May 2022. By that point, the relationship was beyond repair. The parties introduced ample evidence to show that DeVore-Slaughter sought to collect the entire $8,000 multiple times over the next year. The evidence of DeVore-Slaughter's collection efforts and of the proceedings in the bankruptcy case that was filed in October 2023 is immaterial to this proceeding so it will not be recited here. Similarly, the back-and-forth about the parties' interactions with each other post-dating the bankruptcy filing is immaterial and plays no role in this decision.

The Court does note that DeVore-Slaughter authored a Facebook post around July 2023, in which she warned others about Bennett. DeVore-Slaughter claimed then that Bennett had told her in December 2021 that she was "refinancing" her home right after the first of the year and that she would be repaid in full by the end of January 2022. Defendant's Exhibit E. That Facebook post, authored more than a year after both the loan was issued and the relationship subsequently deteriorated, is self-serving and is not probative as to the actual terms of the loan.

### B.    Court's finding of facts

DeVore-Slaughter testified that Bennett had asked for $7,500 to pay her delinquent property taxes for tax years 2019–22, which were purportedly due by January 1, 2022. The Court does not find that account credible.

---

[5] Bennett told DeVore-Slaughter that she was deducting $300 because she'd rendered $300 worth of services at her salon to DeVore-Slaughter (3 haircut-and-colors at $60 each) and her son, Hultgren (2 haircut-and-colors at $60 each). Plaintiff's Exhibit 3. Hultgren agreed that he had received services on two occasions from Bennett, though he mentioned that he supplied the color for one of the appointments.

First, as Bennett testified, she has never paid real estate taxes directly. The Mercer County Property Tax Inquiry[6] shows that Bennett did not personally make tax payments (Midwest Bank, her mortgagee, made the payments for her), nor was she behind on them. The Court takes judicial notice of those records, which are consistent with Plaintiff's Exhibit 6. See *In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 483 (Bankr. S.D. Ohio 2011) (holding court may take judicial notice of records contained on website maintained by county authority regarding real estate taxes). And in Illinois, real estate taxes are due the year following their assessment. In other words, neither the 2021 nor 2022 taxes would have been due at the time DeVore-Slaughter signed the $8,000 check. Bennett did not owe any money, let alone $7,500, in back property taxes in December 2021.

Second, the genesis of the loan is documented in the text messages that the parties exchanged. Bennett asked for $5,000 to cover her credit card debt. She then mentioned that she actually owed $7,000. DeVore-Slaughter generously told Bennett, "I can get the whole 7000.00," before the two discussed possible repayment options. The very next day, DeVore-Slaughter signed the $8,000 check. No evidence—apart from DeVore-Slaughter's testimony at trial, which the Court does not credit on this point—suggests that Bennett ever mentioned real estate taxes. Instead, the evidence is replete with references to Bennett's credit card debt. Bennett's later assertions to DeVore-Slaughter that the loan paid her credit card debt are self-serving and less probative than the December 2021 texts, but the lack of any reaction in surprise from DeVore-Slaughter suggests that Bennett was accurately reciting their agreement when the dispute erupted in April 2022. And indeed, the Court finds that DeVore-Slaughter ratified that understanding of their agreement in her April 18 text message ("…I thought that the money that I gave you was to pay off your credit card….").

DeVore-Slaughter testified at trial that Bennett promised to pay her back by January 2022 by refinancing her home. The Court does not find that testimony credible. Again, the text messages from December 2021 show that DeVore-Slaughter was anticipating being paid back on a weekly or monthly basis: "[T]his would be good because [] once I get the house your extra $400 coming in every month will help me make my mortgage so it's a good thing" to pay back in installments. Defendant's Exhibit D. At some point, the idea of repaying the loan through refinancing did come up. Bennett mentioned on April 3, 2022, that she was trying to obtain a loan from the

---

[6] https://merceril.devnetwedge.com/parcel/view/141424302004/2023

9

bank, and five days later she reported that she was unable to obtain such a loan. But there is no evidence that the $8,000 loan was given on the understanding that Bennett would quickly repay the debt by obtaining a loan from the bank. Instead, consistent with the text messages from the day before the loan, DeVore-Slaughter said it was fine for Bennett to "try to start giving $50" per week, which Bennett then referenced in her voicemail on April 18, 2022. The whole thing came to a head, not because Bennett was failing in her obligation to refinance her home, but because she was not making her $50 weekly payments and because the parties fell out after Bennett canceled her plans to travel to New York. Finally, it would not make sense for Bennett to seek a personal loan only to immediately refinance her home to repay the personal loan. If Bennett intended to refinance her home within weeks of seeking the loan from DeVore-Slaughter, why would she not just skip the middleman and obtain a loan directly from the bank in December 2021?

There are two possibilities. Either Bennett lied to DeVore-Slaughter about easily ascertainable facts (supposedly delinquent property taxes) and made an illogical request (please lend me money that I will pay back almost immediately), or DeVore-Slaughter has reverse-engineered a set of facts to explain why she made an unwise $8,000 loan to a friend who did not pay her back. The Court finds that the latter is more likely. In her investigation into Bennett's finances, DeVore-Slaughter went to the Mercer County Courthouse and learned that Bennett had paid about $7,500 in real estate taxes for tax years 2019–22. She also knew about the possibility of repayment through home refinancing based on their discussions about Bennett's attempt to add $5,000 to her mortgage in an attempt to pay back the loan. The actual December 2021 agreement to pay off Bennett's credit card debt in regular payments became transformed in DeVore-Slaughter's mind into a version of events that proved her a victim of not just a bad friend but also a fraudster. That version of events is not objectively credible.

In short, the Court finds that DeVore-Slaughter was not credible in testifying that (1) Bennett requested the loan to pay back real estate taxes before the first of the year, and (2) Bennett promised to pay back the loan by January 2022 by refinancing her home. Instead, the Court finds that DeVore-Slaughter wrote Bennett an $8,000 check on December 28, 2021 because she wanted to help someone she considered a friend out of the credit card debt she had fallen into. With her recent inheritance, DeVore-Slaughter was able to make a magnanimous gesture. She believed that her friend would repay her over time. It was only after the friendship crumbled—following disappointment and bitterness when Bennett (having already failed to make any weekly loan repayments)

10

pulled out of the New York trip—that DeVore-Slaughter began insisting on repayment on stricter terms. The evidence shows that the loan was not based on Bennett's misrepresentations but on DeVore-Slaughter's desire to do her friend a favor when she was in a position to do so.

### C. Evidence of other bankruptcy fraud

DeVore-Slaughter spent a good deal of her case attempting to prove that Bennett had defrauded not only her but the bankruptcy system. For several reasons, that evidence is legally irrelevant here. See in particular Fed. R. Evid. 404(b)(1) ("Evidence of any other … wrong[] or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.")[7]. Even if it were relevant, there is insufficient evidence that Bennett intended to defraud her creditors. The Court found Bennett's responses to the various alleged discrepancies that DeVore-Slaughter pointed out to be credible and satisfactory. Bennett did not believe she lived "with" anyone at the time she filed her bankruptcy petition, because her mother and sister occupied a separate apartment on her property. Whether Bennett considered DeVore-Slaughter an "occasional client" or a "friend" is inconsequential. Bennett did not pay income taxes since 2019 because she did not make enough money to owe taxes. And so forth. To the extent DeVore-Slaughter presented other evidence tending to show that Bennett was untruthful in her dealings with the bankruptcy court, the Court is not convinced and finds that Bennett's testimony was generally credible concerning what she did and said in the bankruptcy case.

The Court will highlight two issues, for illustration. First, DeVore-Slaughter introduced evidence to try to show that Bennett doctored a letter from her bankruptcy attorney. Plaintiff's Exhibits 7, 8. Bennett submitted two letters in advance of trial, Doc. #24-6; one letter is an undated cease and desist notice under the Fair Debt Collection Practices Act addressed to DeVore-Slaughter (Exhibit 7), and one letter, dated November 23, 2023, warns DeVore-Slaughter not to violate the automatic stay of 11 U.S.C. §362 (Exhibit 8). DeVore-Slaughter testified that she received Exhibit 7 from Bennett's counsel but did not receive Exhibit 8. The Court fails to see the relevance.

---

[7] Technically, Rule 404(b) renders evidence inadmissible, not irrelevant. With one exception, neither party objected to the admission of evidence on relevance grounds, and the Court was lenient in admitting evidence in the absence of objection. So while the evidence was admitted without objection, the Court places little to no weight on the evidence because the law does not consider that evidence to be important in resolving the dispute.

11

Even if DeVore-Slaughter did not receive Exhibit 8, there is no evidence that Exhibit 8 was doctored in any way by Bennett as opposed to being a document Bennett received from her lawyer. Second, DeVore-Slaughter also introduced evidence that Bennett wrote to the Court early in this case and said that she was writing "today, Thursday, March 11, 2024 because I received an email from my lawyer today…." Plaintiff's Exhibit 9. The lawyer's email is dated April 11. *Id*. March 11 was a Monday; April 11 was a Thursday. The Court received the letter on April 15. Doc. #14. The Court has zero doubt that Bennett simply made a mistake and wrote "March" instead of "April." Inconsequential mistakes like that are not proof of fraud.

The Court was attentive during trial and carefully observed the demeanor and testimony of each witness. The Court has reviewed all exhibits introduced by the parties and admitted into evidence. The Court finds that Bennett's account of the December 2021 loan was roughly accurate and that DeVore-Slaughter's was not. No evidence was presented to support a finding that is Bennett did not intend to repay the loan, as she promised, at the time she requested the money, and the Court does not believe that the evidence that was admitted concerning what happened after the loan was made supports that inference.

### III.   Conclusions of law

An eligible Chapter 7 debtor is entitled to a discharge of all debts that arose before the date of the bankruptcy petition "[e]xcept as provided in section 523" of the Bankruptcy Code. 11 U.S.C. §727(b). Section 523(a)(2)(A)'s exception prevents a court from discharging "any debt … for money … to the extent obtained by … a false representation…." The exception applies when (1) the debtor made a statement either knowing it to be false or with reckless disregard for the truth; (2) in making this misrepresentation the debtor intended to deceive; and (3) the creditor actually and justifiably relied upon the misrepresentation. *Field v. Mans*, 516 U.S. 59, 73–76 (1995); *Matter of Scarlata*, 979 F.2d 521, 525 (7th Cir. 1992). The creditor bears the burden of proving an exception to discharge. *Grogan v. Garner*, 498 U.S. 279, 291 (1991)

DeVore-Slaughter alleged that Bennett made a misrepresentation to obtain the $8,000 check. Namely, she alleged that Bennett told her that she needed the money to pay her delinquent real estate taxes and that she intended to refinance her home in order to pay her back quickly. DeVore-Slaughter did not meet her burden of proof on that allegation. To the contrary, the Court finds it is more likely than not that Bennett

12

obtained the loan, having learned of DeVore-Slaughter's recent inheritance, by asking for help in paying down her credit card debt. DeVore-Slaughter, who considered herself a good friend to Bennett, was happy to oblige. DeVore-Slaughter failed to prove any of the three elements under §523(a)(2)(A): she did not prove that Bennett made a false statement; she did not prove that Bennett intended to deceive; and she did not prove that she justifiably relied upon a misrepresentation.

Nothing more needs to be said. For the parties' benefit, though, the Court did construe DeVore-Slaughter's evidentiary presentation as an invitation to draw an inference that Bennett never intended to pay back the loan because she knew it could be discharged in bankruptcy. That would constitute actual fraud, which is another exception to discharge (along with a misrepresentation) listed in §523(a)(2)(A). While a broken promise to pay is not in itself fraud, a broken promise may constitute fraud if the promising party never intended to pay. *In re Fenner*, 558 B.R. 877, 885 (Bankr. N.D. Ill. 2016). Construing DeVore-Slaughter's *pro se* complaint and arguments liberally, the Court considered whether the $8,000 loan was obtained as the result of actual fraud. Bennett promised to pay back the loan but never did; and her previous bankruptcy experience (she filed in 2015) might have supplied her with knowledge that she could get away with never paying back the loan so long as she could stall for two years before becoming eligible to file for bankruptcy again. See 11 U.S.C. §727(a)(8) (preventing successive discharge before 8 years pass).

But again, given the Court's factual findings above, DeVore-Slaughter failed to prove it was more likely than not that Bennett never intended to pay back the loan. The Court believes there is insufficient evidence to support that inference. So even if DeVore-Slaughter were attempting to prove actual fraud, her evidentiary presentation did not satisfy her burden of proof.

Because the Plaintiff did not prove that it is more likely than not that the $8,000 debt was obtained by a false representation, the Defendant is entitled to judgment in her favor. The debt will not be excepted from Bennett's discharge.

DeVore-Slaughter did request, if the Court were to find for Bennett as it has, that the Court authorize her to issue an IRS Form 1099-C ("Cancellation of Debt") to Bennett. That request is denied. DeVore-Slaughter is directed to IRS Publication 4681 (available at https://www.irs.gov/pub/irs-pdf/p4681.pdf), which explains on page 6 that debt

canceled in a title 11 bankruptcy case (like Bennett's) is not included in a debtor's income. In any event, Bennett's tax obligations are not at issue in this adversary.

    A separate judgment will issue. Fed. R. Bankr. P. 7058.

###